United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued September 18, 1997 Decided March 27, 1998

 

 

 No. 97-1204

 National Treasury Employees Union, 

 Petitioner

 v.

 Federal Labor Relations Authority, 

 Respondent

 American Federation of Government Employees, AFL-CIO, 

 Intervenor

 On Petition for Review of an Order of the 

 Federal Labor Relations Authority

 ----------

 


 No. 92-5272

 National Treasury Employees Union, et al.,

 Appellees

 v.

 John Callahan, Acting Administrator, Social Security 

 Administration, et al.,

 Appellants

 American Federation of Government Employees, Local 888,

 Appellant

 Consolidated with

 No. 92-5307

 

 

 Appeals from the United States District Court 

 for the District of Columbia 

 (No. 91cv02404)

 In case No. 97-1204, Elaine D. Kaplan argued the cause 
for petitioner National Treasury Employees Union, with 
whom Gregory O'Duden was on the briefs.

 David M. Smith, Solicitor, Federal Labor Relations Au-
thority, argued the cause for respondent FLRA, with whom 
James F. Blandford and Shari Polur, Attorneys, were on the 
brief. William R. Tobey, Deputy Solicitor, entered an ap-
pearance.

 Mark D. Roth and Judith Galat were on the brief for 
intervenor American Federation of Government Employees, 
AFL-CIO.

 In case Nos. 92-5272 and 92-5307, Judith Galat argued the 
cause for appellant American Federation of Government Em-
ployees, Local 888, with whom Mark D. Roth was on the 
briefs.


 R. Craig Lawrence, Assistant U.S. Attorney, argued the 
cause for the Federal appellants, with whom Mary Lou 
Leary, U.S. Attorney at the time the briefs were filed, was on 
the briefs. John D. Bates, Assistant U.S. Attorney, entered 
an appearance.

 Elaine D. Kaplan argued the cause for appellees National 
Treasury Employees Union, et al., with whom Gregory O'Du-
den was on the brief. Clinton D. Wolcott entered an appear-
ance.

 Before: Wald, Silberman, and Ginsburg, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Ginsburg.

 Ginsburg, Circuit Judge: The Social Security Administra-
tion several times denied the National Treasury Employees 
Union a permit to distribute leaflets in front of the SSA 
buildings on the government campus in Woodlawn, Maryland. 
The NTEU filed unfair labor practice charges with the Fed-
eral Labor Relations Authority, and sued the Administrator 
of the SSA in district court alleging a violation of the First 
Amendment to the Constitution of the United States.

 In No. 97-1204 the NTEU petitions for review of the 
decision of the Federal Labor Relations Authority that the 
permit denials neither discriminated against the NTEU nor 
unlawfully assisted the incumbent union, the American Fed-
eration of Government Employees. We uphold the FLRA's 
decision that the SSA did not unlawfully assist the AFGE. 
The FLRA's decision that the SSA did not discriminate 
against the NTEU, however, was premised upon an errone-
ous reading of the case law, and we therefore remand that 
aspect of the case to the FLRA for reconsideration.

 In Nos. 92-5272 and 92-5307 the SSA and the AFGE 
appeal the decision of the district court holding that the SSA's 
denials of a permit to the NTEU to distribute literature at 
Woodlawn abridged the NTEU's freedom of speech, in viola-
tion of the first amendment. We remand this claim for the 


district court to determine whether there is still a case or 
controversy between the parties in light of our decision in No. 
97-1204.

 I. Background

 The controversy among the NTEU, the SSA, and the 
AFGE began in 1991 when the NTEU, which was organizing 
a nationwide campaign to replace the AFGE as the exclusive 
bargaining representative of SSA employees, applied several 
times for a permit to distribute leaflets outside the SSA 
buildings on the Woodlawn campus. The SSA denied each 
request on the ground that the Federal Service Labor-
Management Relations Act, 5 U.S.C. s 7116(a)(3), so re-
quired. See, e.g., Letter to Clinton Wolcott, Assistant Coun-
sel, NTEU, from Marilyn G. O'Connell, Acting Associate 
Commissioner for Facilities Management, SSA (Sept. 24, 
1991) (stating that "the agency in 'control' of the premises 
must deny access to the nonincumbent union absent an 
inability to reach the agency's employees through reasonable, 
alternative means of communication"). Section s 7116(a)(3) 
makes it an unfair labor practice for an agency to

 sponsor, control, or otherwise assist any labor organiza-
 tion, other than to furnish, upon request, customary and 
 routine services and facilities if the services and facilities 
 are also furnished on an impartial basis to other labor 
 organizations having equivalent status.

The Act also makes it an unfair labor practice to "interfere 
with, restrain, or coerce any employee in the exercise by the 
employee of any right under this [statute]." Id. s 7116(a)(1).

 The NTEU sued the Administrator of the SSA and other 
officials in district court, claiming that the SSA's denials of its 
applications for a permit violated the Union's right to free 
speech under the first amendment. The district court held 
that the SSA had indeed violated the first amendment by 
denying to the NTEU the right to speak in a "public forum," 
see NTEU v. King, 798 F. Supp. 780 (D.D.C. 1992), and the 
SSA appealed to this court.

 The NTEU also filed a charge with the FLRA claiming 
that the SSA's denial of its applications for a permit was an 


unfair labor practice. The FLRA held that the SSA had 
acted correctly under the circumstances for two reasons. 
First, the SSA's refusal to issue a permit did not violate 
s 7116(a)(1) of the FSLMRA because that subsection pro-
tects only the rights of employees; it does not give a non-
incumbent union any right of access to the property of the 
employing agency, at least where the complainant is not an 
affected employee. Second, to have issued a permit, accord-
ing to the FLRA, would have "assisted" the NTEU, in 
violation of s 7116(a)(3) of the Act. See Social Security 
Administration and National Treasury Employees Union 
and American Federation of Government Employees, 45 
FLRA 303 (1992).

 Upon the NTEU's petition for review of the decision of the 
FLRA, we held that the Authority had erred in failing to 
consider the first amendment implications of its decision and 
we remanded the matter to the Authority for reconsideration. 
See NTEU v. FLRA, 986 F.2d 537 (D.C. D.C. 1993). We then 
held the SSA's appeal of the district court's decision in 
abeyance pending the outcome of the proceedings upon re-
mand before the FLRA.

 Upon remand the FLRA took as its starting point the 
analytical framework set out by the Supreme Court in NLRB 
v. Babcock & Wilcox Co., 351 U.S. 105 (1952), for dealing with 
the union access issue as it arose under the National Labor 
Relations Act. See Social Security Administration and Na-
tional Treasury Employees Union and American Federation 
of Government Employees, 52 FLRA 1159, at 29-30 (1997). 
The FLRA recognized that the initial organizing campaigns 
generally analyzed in Babcock & Wilcox and "its progeny" did 
not match the facts of the current case; purportedly applying 
the principles of Babcock & Wilcox, however, the FLRA held 
that the SSA's denials of the NTEU's permit requests did not 
violate s 7116(a)(1) of the FSLMRA because the NTEU 
failed to show that such denials discriminated against the 
NTEU. The Authority also held that the SSA had not, by 
denying the permit requests of the NTEU, assisted the 
AFGE in violation of s 7116(a)(3). The NTEU now petitions 
the court to review both aspects of that decision.


 II. No. 97-1204

 The NTEU does not challenge the Authority's adoption of 
the Babcock & Wilcox framework. The Union does argue, 
however, that under that framework the SSA should be held 
to have discriminated against the NTEU and to have unlaw-
fully assisted the incumbent AFGE.

A. s 7116(a)(1)

 After stating that it was adopting the framework of Bab-
cock & Wilcox and its progeny "as a starting point" for 
analysis, see 52 FLRA 1159, at 27, the FLRA described that 
framework as follows: In Babcock & Wilcox the Supreme 
Court held that an employer subject to the NLRA may 
maintain a general policy of denying non-employee solicitors 
access to its premises; it may not discriminate against union 
solicitors, however, by granting access to solicitors for other 
types of organizations. See 351 U.S. at 112. The excluded 
"union has the burden of showing that ... the employer's 
access rules discriminate against the union's solicitation." 
NLRB v. Southern Maryland Hospital Center, 916 F.2d 932, 
936 (D.C. Cir. 1990) (quoting Sears Roebuck & Co. v. San 
Diego County District Council of Carpenters, 436 U.S. 180, 
205 (1978)).

 The National Labor Relations Board has created, and this 
court has approved, an exception to the general rule of 
Babcock & Wilcox for "isolated beneficent acts": An employ-
er that has a no-solicitation rule but nonetheless grants access 
to a few charitable organizations does not thereby lose its 
right to exclude unions under its general rule against solicita-
tion. See Lucile Salter Packard Children's Hosp. v. NLRB, 
97 F.3d 583, 587 (D.C. Cir. 1996); Hammary Mfg. Corp., 265 
NLRB 57, 57 n.4 (1982). In deciding whether grants of 
access to charitable organizations fall within the "isolated 
beneficent acts" exception, the Board does not employ a per 
se approach but rather looks at the "quantum of ... inci-
dents." Hammary, 265 NLRB at 57 n.4.

 Stating that "[t]he NLRB's interpretation and application 
of Babcock's nondiscrimination rule has been reviewed by 


several United States Courts of Appeals," the FLRA then 
cited without analysis certain conflicting decisions applying 
Babcock & Wilcox. 52 FLRA 1159, at 28. From this de-
scriptive exercise (or at least after it) the FLRA concluded 
that "[t]he principles articulated in the [cited] decisions sug-
gest that '[b]y inviting the public to use an area of its 
property, the employer does not surrender its right to control 
the uses to which that area is put.' " Id. (quoting Baptist 
Medical System v. NLRB, 876 F.2d 661, 664 (8th Cir. 1989).

 Turning to the facts of this case, the Authority said there 
could be "no doubt that SSA has differentiated among the 
organizations that it has allowed to solicit"; specifically, while 
denying the NTEU's requests for permits, the SSA had 
granted permits to several "beneficent organizations" to soli-
cit money or membership--including the Disabled American 
Veterans, the American Legion, the Little Sisters of the Poor, 
and Mothers Against Drunk Driving. 52 FLRA 1159, at 30. 
The FLRA found, however:

 [T]he record is silent as to whether any other [i.e., non-
 beneficent] organizations have sought, been granted, or 
 been denied access to SSA's premises.

 ... Moreover, the parties' arguments do not address 
 whether the number of permits granted during the time 
 period have been isolated and limited to a small number 
 of beneficent organizations.... As a result, we do not 
 find that SSA's denial of access to NTEU, which oc-
 curred during the same time period that it granted 
 occasional access to charitable organizations, violated the 
 Babcock non-discrimination rule.

Id.

 The NTEU argues that upon the present facts the FLRA 
erred in finding no violation of the general rule of Babcock & 
Wilcox. We agree. Under that rule, the SSA's denial of the 
NTEU's permit request while granting permits to other 
organizations would be unlawful discrimination unless the 
exception for isolated beneficent acts (or some other excep-
tion) applies. The predicate for the rule is lacking here, 
however: the SSA does not have a general no-solicitation 
policy. To the contrary, the agency administers its permit 
process pursuant to the Federal Property Management Regu-


lations, by authority delegated from its landlord, the General 
Services Administration. The FPMR states that every appli-
cation for a permit must be granted unless it is faulty in form 
or the proposed use falls into one of five specifically excluded 
categories. See 41 C.F.R. s 101-20.402(a) ("A permit shall be 
issued ... within 10 working days following [the administer-
ing agency's] receipt of the completed applications"); id. 
s 101- 20.403(a) (the agency "shall disapprove any application 
... if" the proposed use is commercial, obscene, intended to 
influence judicial proceedings, interferes with government 
uses of the property, or violates the prohibition against 
political solicitation in 18 U.S.C. s 607).

 Because the SSA does not have a general no-solicitation 
policy, Babcock & Wilcox and its sequelae do not protect the 
SSA's denial of permits to the NTEU. Moreover, even if the 
SSA did have a general no-solicitation policy, we would have 
to fault the Authority for applying the isolated beneficent acts 
exception without examining the "quantum ... of incidents" 
in which the SSA granted permits to beneficent organizations, 
as it should have done before finding that the SSA's prior 
"beneficent acts" were indeed "isolated." To the extent that 
the FLRA relies upon Babcock & Wilcox and "its progeny," 
therefore, the Authority's interpretation of the case law is 
erroneous and we must reverse its decision based thereon.

 Our analysis does not end here because the FLRA was not 
required to adopt the rule of Babcock & Wilcox in the first 
place; nor, having done so, was it required to adopt the 
NLRB's exception for isolated beneficent acts. It is possible 
that the Authority intended, by its summary statement of the 
case law secondary to Babcock & Wilcox, to articulate its own 
standard under the FSLMRA, one more deferential to the 
federal agency employer than is the standard of Babcock & 
Wilcox to private employers. (Recall that the Authority had 
concluded that the cases "suggest that by inviting the public 
to use an area of its property, the employer does not surren-
der the right to control the use to which that area is put.") 
Such a standard might, for example, permit an agency em-
ployer to exclude union solicitors from its premises while 
allowing all (or almost all) manner of other groups to engage 
in solicitation pursuant to the FPMR. To the extent that the 
FLRA may have intended to create any such new standard, 


however, that standard raises a serious constitutional ques-
tion, as we have previously pointed out in this very litigation, 
see NTEU v. FLRA, 986 F.2d 537, 539-40 (D.C. Cir. 1993); it 
also lacks any grounding in the cases cited, and the Authority 
neither described it clearly enough nor explained its reason-
ing sufficiently to permit us to affirm its decision upon that 
basis. See SEC v. Chenery Corp., 318 U.S. 80, 88 (1943) 
(holding that reviewing court may not affirm agency decision 
on basis of rationale agency itself did not adopt).

 The FLRA also held, as an alternative basis for its conclu-
sion, that even if the SSA did discriminate against the NTEU 
the Authority would not apply the standard of Babcock & 
Wilcox retroactively to the actions of the SSA. Rather, the 
Authority would judge the SSA under the standard in place 
when the SSA denied the NTEU's applications for a permit to 
distribute leaflets. See 52 FLRA 1159, at 31 n.25. The 
NTEU objects that the FLRA's concern with retroactivity is 
misplaced because the Union seeks only forward-looking re-
lief, and in any case retroactive application of the new rule 
would be permissible under the case law of this circuit.

 We agree with the NTEU that the Authority's concern with 
retroactivity is unwarranted. If the Authority does conclude 
upon remand that the SSA engaged in an unfair labor prac-
tice, then the SSA will not be unfairly imposed upon by the 
relief to which the NTEU would be entitled. A declaration to 
the effect that an employer committed an unfair labor prac-
tice, when based upon a newly-adopted standard, is indeed 
retroactive but only in the way familiar to private sector labor 
law and indeed inherent in both administrative and common 
law adjudication. See, e.g., Consolidated Freightways v. 
NLRB, 892 F.2d 1052, 1058 (D.C. Cir. 1989) ("new rules 
announced in agency adjudications may be applied retroac-
tively absent any 'manifest injustice' "); Daily News of Los 
Angeles v. NLRB, 73 F.3d 406 (D.C. Cir. 1996) (upholding 
NLRB decision finding newspaper liable for unfair labor 
practice by overruling prior Board decision); 13A Wright, 
Miller & Cooper, Federal Practice and Procedure: Jurisdic-
tion 2d s 3535 n.20 ("[o]rdinarily the litigants in the case 
producing a new rule of law are controlled by the new rule"). 


Indeed, the SSA does not even face potential liability for 
backpay or other material relief to which employers in both 
the public and the private sector are routinely exposed upon 
the basis of "retroactive" adjudication. To the extent that the 
FLRA, upon further reconsideration, adheres to the standard 
of Babcock & Wilcox, therefore, it may not decline to find a 
violation merely because it had not yet adopted that standard 
when the SSA denied the NTEU's requests for permits.

 In sum, we remand to the FLRA the question whether the 
SSA violated s 7116(a)(1); the Authority may either reaffirm 
its embrace of the Babcock & Wilcox standard and hold that 
the SSA discriminated against the NTEU in violation of that 
section, or it may adopt some other standard by which to 
judge the SSA's denial of permits to the NTEU. If the SSA 
violated the Act under whatever standard the FLRA adopts, 
however, then the Authority may not deny the NTEU a 
remedy on the ground that it must avoid retroactive law-
making.

B. s 7116(a)(3)

 The FLRA also held that the SSA's denial of permits to the 
NTEU did not violate s 7116(a)(3), which makes it an unfair 
labor practice for an employee to assist a labor union. Ac-
cording to the Authority "there are certain advantages that 
go with incumbency," and "denial of access to a rival, in and 
of itself, does not equate to sponsorship, control, or assistance 
to the incumbent"; nor was there any evidence that the SSA 
had "sponsor[ed], control[led], or assist[ed] AFGE" in any 
other way. 52 FLRA 1159, at 23. The NTEU objects that 
the AFGE did benefit--in the form of enhanced prospects for 
re-election--from the disadvantage the NTEU incurred in 
being denied access to the grounds of the SSA, and because 
the denials of the permits were unlawful, the advantage 
gained by the AFGE was a fortiori unlawful assistance.

 The FLRA approached this issue, reasonably we think, by 
asking the functional question whether the employer "inter-
fered with employee freedom of choice by failing to maintain 
the appropriate arms-length relationship with the labor orga-


nization involved." 52 FLRA 1159, at 22. Answering the 
question by reference to the totality of the circumstances, the 
Authority concluded that the advantage the SSA indirectly 
conferred upon the incumbent AFGE--by excluding the rival 
NTEU from the agency's premises--did not constitute assis-
tance, sponsorship, or control within the meaning of those 
terms in s 7116(a)(3):

 [T]here is no evidence that through this denial of access 
 SSA interfered with its employees' freedom of choice or 
 failed to maintain the proper arms-length relationship 
 with AFGE.... [T]here is no evidence that AFGE is 
 ... controlled by SSA.... Nor is there evidence that 
 the denial was viewed by the employees as indicative of 
 the agency favoring AFGE.

52 FLRA 1159, at 23.

 In this context "evidence" includes not only empirical data 
but also the Authority's expert judgment on the question 
whether the employer's conduct tends to interfere with the 
employees' freedom of choice. Cf. NLRB v. Curtin Matheson 
Scientific, Inc., 494 U.S. 775, 792-93 (1990) (finding it not 
irrational for NLRB to refuse to apply presumption that 
replacement workers do not support striking union, in light of 
Board's assumptions drawn from its expertise); General 
Electric Company v. NLRB, 117 F.3d 627, 636 (D.C. Cir. 
1997) (enforcing Board decision that distribution of post-
election benefits while objections to election were still unre-
solved was impermissible attempt to interfere with employ-
ees' freedom of choice about unionization). We therefore 
affirm the Authority's interpretation of the record upon the 
ground that the Authority, in the exercise of its expert 
judgment, found no reason to believe that the employer failed 
to maintain the appropriate arms-length relationship with the 
AFGE. Consequently, we need not determine whether, as 
the FLRA seems to have believed, the AFGE was entitled to 
the advantage of exclusive access to the sidewalks as a benefit 
of incumbency.

 III. Nos. 92-5272 and 92-5307

 The first amendment claim in the AFGE's appeal from the 
decision of the district court, which we have heretofore held 


in abeyance, may now be moot by virtue of the FLRA's 
change of position in the unfair labor practice case. The 
FLRA's current position constitutes a retreat--without objec-
tion on the part of the AFGE--from the position the Authori-
ty took in its first decision, namely, that the FSLMRA 
required the SSA to deny the permit request of a non-
incumbent union. Assuming the FLRA adheres to the 
framework of Babcock & Wilcox upon remand, therefore, the 
SSA will not be able to deny on that ground any future 
permit application the NTEU may file. Indeed, the SSA may 
well have to grant the NTEU's next request for a permit--in 
which case there would seem to be no continuing controversy 
and no need for the court to resolve the constitutional ques-
tion.

 Moreover, even if the SSA does again deny a permit to the 
NTEU, it will presumably do so in a manner consistent with 
the FLRA's new interpretation of the Act. Any such denial 
would therefore have to depend upon a rationale different 
from the SSA's reason for denying the NTEU's permit in 
1991. To decide now whether a hypothetical future permit 
denial by the SSA would violate the first amendment would 
be to risk giving an advisory opinion in an area where the 
court should be particularly keen to avoid any unnecessary 
ruling. See Clinton v. Jones, 117 S. Ct. 1636, 1642 n.11 (1997) 
("It has long been the Court's considered practice not to 
decide abstract, hypothetical or contingent questions ... or to 
decide any constitutional question in advance of the necessity 
for its decision....").

 In sum, the constitutional issue arising from the permit 
denials of 1991 may be moot as a practical matter. See 
Belton v. Washington Metropolitan Area Transit Authority, 
20 F.3d 1197, 1203 (1994) (decision to require retrial based 
upon one issue makes other issue "moot as a practical matter 
although not in the strict sense"). The issue of mootness was 
not briefed by the parties, however, and the record before us 
is stale inasmuch as the FLRA has redefined, and may yet 
further redefine, the obligations of the SSA under the 
FSLMRA. We therefore remand this case for the district 
court to determine in the first instance, upon the basis of an 


updated record if that seems advisable, whether there is a 
live constitutional case or controversy between the parties.

 IV. Conclusion

 In No. 97-1204 the FLRA permissibly concluded that the 
SSA's denial of a permit to the NTEU did not "assist" the 
AFGE in violation of s 7116(a)(3) of the FSLMRA. On the 
other hand, the Authority's conclusion that the SSA did not 
discriminate against the NTEU in violation of s 7116(a)(1) of 
the FSLMRA is based upon an erroneous reading of the 
Babcock & Wilcox line of cases. We therefore affirm the 
decision of the FLRA upon the first issue and remand the 
second issue to the Authority for further consideration. We 
also remand the first amendment cases, Nos. 92-5272 and 
92-5307, to the district court for a determination of whether 
that dispute is (or with the issuance of the opinion in No. 
97-1204 is about to become) moot.

 So ordered.